AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
OCT 11 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. **19MJ4491**
)
Grey Samsung Galaxy S8 )
Model: SM-G950F (64 GB); IMEI: 358957/08/289145/7 )
S/N: R28K62ZSBZB )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with Intent to Distribute Methamphetamine |

The application is based on these facts:

See attached affidavit of DEA Special Agent James Huynh.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA Special Agent James Huynh
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/11/19

_____
*Judge's signature*

City and state: San Diego, California    Hon. Linda Lopez, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Special Agent James Huynh, being duly sworn, hereby state as follows:

### INTRODUCTION

1. This affidavit supports an application for a warrant to search the following:

   a. Phone type: Grey Samsung Galaxy S8
   Model: SM-G950F (64 GB)
   IMEI: 358957/08/289145/7
   S/N: R28K62ZSBZB
   (**Target Device**)

   as described in Attachment A, and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section 841 – Possession with Intent to Distribute Controlled Substances. This search supports an investigation and prosecution of Saul Ignacio AYON-Arredondo ("Defendant") for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Device** was seized on September 5, 2019 at the United States Border Patrol (USBP) Interstate 8 Westbound Checkpoint in Pine Valley, CA. The **Target Device** was seized from AYON-Arredondo pursuant to his arrest for possession with intent to distribute federally controlled substances. The **Target Device** is currently stored as evidence at Drug Enforcement Administration (DEA) San Ysidro Resident Office (SYRO) located at 2255 Niels Bohr Court, San Diego, CA 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding

1

this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5. I am a United States Drug Enforcement Administration (DEA) Special Agent (SA) and an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). Further, I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

6. I am currently assigned to the San Diego Field Division (SDFD), San Ysidro Resident Office (SYRO), Group 72. I am empowered to conduct investigation and to make arrests for federal felony offenses. I was hired by the DEA in March 2017, and attended the DEA Academy from March through July of 2017. At the academy, I was trained in all aspects of conducting narcotics investigations. On July 21, 2017, I was sworn as a DEA Special Agent and, since then, have been involved in several narcotics investigations along with senior DEA special agents.

7. I have spoken with other agents about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations. I have become familiar with the methods of operation typically used by narcotics traffickers. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. Based on my training and experience, I have learned that load drivers smuggling controlled substances are often in telephonic contact with co-conspirators to determine where and when to deliver the controlled substances.

2

8. Moreover, I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I have learned that professional narcotics operations depend upon maintaining their extensive contacts. The use of telephones is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers. The telephone enables narcotics dealers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers. I also have learned that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

9. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Drug smugglers will use cellular/mobile telephones to notify or warn their

3

            accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

      f.     Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

      g.    The use of cellular/mobile telephones by drug smugglers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

10. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, based upon my training, education, and experience that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

      a.    tending to identify attempts to possess with intent to distribute methamphetamine or some other federally controlled substance;

4

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the possession with intent to distribute methamphetamine or some other federally controlled substance;

c. tending to identify co-conspirators, criminal associates, or others involved in the possession with intent to distribute methamphetamine or some other federally controlled substance;

d. tending to identify travel to or presence at locations involved in the possession and distribution of methamphetamine or some other federally controlled substance, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**FACTS SUPPORTING PROBABLE CAUSE**

12. On September 5, 2019, at approximately 1:30 p.m., SA Huynh responded to the United States Border Patrol station located in Pine Valley, California to meet with Border Patrol Agent (BPA) R. Lopez regarding the arrest of Saul Ignacio AYON-Arredondo and the seizure of approximately 5.10 kilograms (11.22 pounds) of methamphetamine.

13. On September 5, 2019, Border Patrol Agent R. Lopez was assigned inspection duties at the Interstate 8 westbound checkpoint located near Pine Valley, California. All signs, lights, and cones were fully functional and visible to the motoring public. The immigration checkpoint is located in the Campo Station's area of responsibility, and is approximately 7 miles east of the Tecate, California Port of Entry and 14 miles north of the United States/Mexico International Boundary.

14. At approximately 11:19 a.m. a blue Honda Accord coupe, bearing California license plate number 8ASJ100, approached the primary inspection point and BPA Lopez questioned the driver, later identified as Saul Ignacio AYON-Arredondo

5

regarding his country of citizenship. AYON replied he was a United States citizen. BPA Lopez asked AYON about his purpose for traveling to San Diego. AYON stated he was in route to San Diego to take pictures for a company. BPA Lopez noticed AYON was avoiding eye contact and answered the questions as if AYON was in a hurry. BPA Lopez also noticed AYON's voice was cracking during the immigration inspection. Suspecting AYON was not being genuine, BPA Lopez directed AYON to the secondary inspection area for further inspection.

15. BPA Canine Enforcement Officer Contreras was standing in primary inspection behind BPA Lopez, who requested BPA Contreras go talk to AYON about his destination of travel. BPA Contreras then followed AYON'S vehicle to the secondary inspection area. In the secondary inspection area, BPA Rodriguez approached AYON and questioned AYON about his country of citizenship. AYON showed BPA Rodriguez a United States Passport card. BPA Contreras entered the vehicle's license plate into the law enforcement database and discovered the vehicle had crossed the Calexico East Port of Entry that same day at 9:52 a.m. BPA Contreras also noticed that AYON was nervous during questioning and his hands were shaking uncontrollably while holding his passport card.

16. BPA Contreras asked AYON for consent to perform a canine sniff of the vehicle. AYON gave consent and was asked to step out of the vehicle. BPA Contreras asked AYON if he was responsible for everything in the vehicle. AYON stated "of course there is nothing in the vehicle it's my Mom's car." BPA Contreras and his canine are certified to detect concealed humans, the odors of marijuana and its derivatives, cocaine and its derivatives, methamphetamine and its derivatives, heroin and its derivatives, and ecstasy. BPA Contreras, utilizing his canine, performed a canine sniff of the Honda and received an alert on the driver's side door. BPA Contreras opened the door and his canine alerted to the back seat.

17. BPA Contreras informed AYON about the canine alert. BPA Contreras informed AYON that the vehicle was going to be moved to the hydraulic lift for further

6

1  inspection. BPA Contreras opened the trunk and found no cameras or equipment used
2  for photography. Instead, BPA Contreras saw two brand new Duralast Brand Battery
3  Jump Starter boxes. BPA Contreras questioned AYON about the jump starters and
4  AYON stated the company he works for provides their employees with battery jumpers
5  in the event the vehicles they drive break down while traveling to San Diego. BPA
6  Contreras moved the vehicle to the hydraulic lift approximately 150 yards east of the
7  checkpoint. BPA Contreras removed one of the jumpers from its box and noticed it was
8  lighter and easier to lift compared to other vehicle battery jumper boxes BPA Contreras
9  had lifted in the past. BPA Contreras also noticed a strong odor of vinegar emitting from
10 the jumper box. BPAs opened the jumper box and noticed a square package wrapped
11 with vinyl tape. BPA Molloy and BPA Bowen tested the substance inside the two black
12 boxes and identified it as crystal methamphetamine. At approximately 12:29 p.m.,
13 BPAs placed AYON under arrest.

14        18.    At approximately 2:05 p.m., TFO Mendoza, as witnessed by TFO Sharp,
15 advised AYON of his Miranda Rights. During his post Miranda statement, AYON
16 stated he worked for a marketing company located in Tijuana, Mexico. However,
17 AYON was not able to provide an address for the company. AYON stated he met one
18 of his bosses in Mexicali, Mexico, who gave him the vehicle battery jumper boxes that
19 were found in his vehicle. AYON denied having knowledge of the drugs inside the
20 vehicle. AYON stated he was instructed to go meet a person at a mechanic shop located
21 in San Diego, California. Upon arriving at the mechanic shop, AYON was supposed to
22 deliver the vehicle battery jumper boxes to an individual who would later transport them
23 to Los Angeles, California. AYON claimed this is his normal work routine and claimed
24 he gets paid $500.00 a week for his services.
25 //
26 //
27 //
28 //

19. The **Target Device** was discovered and seized by United States Border Patrol (USBP) at the time of AYON-Arredondo's arrest.[1] USBP then relinquished custody of **Target Device** to DEA and assumed custody of the **Target Device**.

20. Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe that AYON-Arredondo likely used the **Target Device** to coordinate the possession with intent to distribute federally controlled substances into the United States. In addition, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information may be stored in the memory of the **Target Device**, which may identify other persons involved in narcotics trafficking activities. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of AYON-Arredondo such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**.

21. Finally, I also have learned that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. In my professional training, education and experience, I have learned that this requires planning and coordination in the days, weeks, and often months prior to the event. Given this, I request permission to search the **Target Device** for items listed in Attachment B beginning on June 5, 2019, up to and including September 5, 2019.

//
//

---

[1] On September 5, 2019, agents examined some of the **Target Device's** contents and downloaded the phone using Cellbrite. In an abundance of caution, I ask the court not to consider information agents may or may not have seen during that examination or download in determining whether there is probable cause for the requested warrant.

## METHODOLOGY

22. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" or "airplane mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard-drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including

9

manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

25. Based on all of the facts and circumstances described above, there is probable cause to conclude that AYON-Arredondo used the **Target Device** to facilitate violations of Title 21, United States Code, Section 841.

26. Because the **Target Device** was promptly seized during the investigation of AYON-Arredondo's smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by AYON-Arredondo continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from June 5, 2019, up to and including September 5, 2019.

27. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Special Agent James Huynh
DEA Special Agent

Subscribed and sworn to before me this \_\_11th\_\_ day of October, 2019.

HON. LINDA LOPEZ
United States Magistrate Judge

10